07-1618-cr
United States v. DeFilippo

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued:  June 19, 2008                      Decided: October 10, 2008

                                            Amended: October 16, 2008)

Docket No. 07-1618-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

*-v.-*

JOSEPH MASSINO, ALSO KNOWN AS JOEY MESSINA, JOHN JOSEPH SPIRITO, ALSO KNOWN AS JOHNNY JOE, EMANUEL GUARAGNA, ANTHONY FRASCONE, ALSO KNOWN AS ANTHONY NICOLE, ALSO KNOWN AS ANTHONY THE HAT, ANTHONY SIANO, RUSSEL TRUCCO, ALSO KNOWN AS THE TRUCK, ANTHONY DONATO, VINCENT BASCIANO,

*Defendants*,

PATRICK DEFILIPPO, ALSO KNOWN AS PATTY FROM THE BRONX,

*Defendant-Appellant*.

_____

BEFORE:  HALL, LIVINGSTON, *Circuit Judges*, and MCMAHON, *District Judge.*[*]

_____

---

[*] The Honorable Colleen McMahon, of the United States District Court for the Southern District of New York, sitting by designation.

Defendant-Appellant Patrick DeFilippo appeals from the judgment of the District Court for the Eastern District of New York (Garaufis, *J.*), convicting him of conspiring to racketeer, three counts of illegal gambling (conspiracy and substantive), and conspiring to collect credit through extortionate means. The district court sentenced DeFilippo to a collective term of forty years' imprisonment. On appeal, DeFilippo raises several alleged evidentiary errors, claims insufficiency of the evidence, and attacks his sentence on procedural grounds. We address most of DeFilippo's evidentiary challenges and his sufficiency challenge in a separate summary order. After reviewing DeFilippo's remaining evidentiary challenges concerning the admission of certain testimony by James Tartaglione and his sentencing challenges, we find that the admission of that testimony was in error, but the error was harmless. Accordingly, for the reasons stated herein and in an accompanying summary order, the judgment of conviction and the sentence are AFFIRMED.

––––––––––––––––––––––––

Richard Ware Levitt, New York, New York, *for Defendant-Appellant*.

Winston Y. Chan, Assistant United States Attorney (Greg D. Andres, Peter A. Norling, Amy Busa, Assistant United States Attorneys, *on the brief*), *for* Benton J. Campbell, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Defendant-Appellee*.

––––––––––––––––––––––––

PER CURIAM:

Defendant-Appellant Patrick DeFilippo appeals from the judgment of the District Court for the Eastern District of New York (Garaufis, *J.*), convicting him of conspiring to racketeer, three counts of illegal gambling (conspiracy and substantive), and conspiring to collect on an

extension of credit through extortionate means. The district court sentenced DeFilippo to a collective term of forty years' imprisonment. On appeal, DeFilippo claims several errors: (1) the erroneous admission of several statements by cooperating and expert witnesses; (2) the unwarranted striking of testimony given by a cooperating witness and imposition of restrictions on cross-examination of that witness; (3) insufficiency of the evidence; and (4) procedural unreasonableness in sentencing, consisting of errors in the district court's application of the Guidelines. We address most of DeFilippo's evidentiary challenges and his sufficiency challenge in a separate summary order filed simultaneously herewith. We review here DeFilippo's challenge to the admission of certain testimony given by cooperating witness James Tartaglione, as well as his sentencing challenges. We find that the admission of that testimony was in error, but the error was harmless. Accordingly, for the reasons stated herein and in the accompanying summary order, the judgment of conviction and sentence are AFFIRMED.

## BACKGROUND

On January 11, 2006, a federal Grand Jury returned a Superseding Indictment ("the Indictment") charging Patrick DeFilippo and Vincent Basciano with eleven counts stemming from their involvement with the Bonanno Crime Family ("the Family"), one of the Five Families of New York. The Indictment explained that the Family was "an organized criminal group" that was organized into subgroups headed by captains (or "capos"). The Family's purpose was "to generate money for its members and associates," and it achieved this objective "through various criminal activities." The Indictment accused Basciano and DeFilippo of being members and captains within the Family.

3

Count 1 of the Indictment charged DeFilippo and Basciano with a racketeering conspiracy. The racketeering conspiracy was based on thirteen predicate racketeering acts, all of which allegedly involved both defendants unless otherwise noted: (1) supervision of an illegal gambling business (applicable only to Basciano); (2) illegal gambling involving Joker-Poker machines; (3) conspiracy and attempt to murder David Nunez; (4) bookmaking (applicable only to DeFilippo); (5) extortionate extension of credit (applicable only to Basciano); (6) extortionate extension of credit (applicable only to Basciano); (7) conspiracy to use extortionate means to collect on an extension of credit (applicable only to DeFilippo); (8) collection on an extension of credit through extortionate means (applicable only to DeFilippo); (9) collection on an extension of credit through extortionate means (applicable only to DeFilippo); (10) conspiracy to murder and murder of Gerlando Sciascia (applicable only to DeFilippo); (11) conspiracy to murder and murder of Frank Santoro (applicable only to Basciano); (12) murder-for-hire (applicable only to Basciano); and (13) conspiracy to collect on an extension of credit through extortionate means (applicable only to Basciano).

Counts 2, 3, and 4 all charged offenses related to illegal gambling and bookmaking. Count 5 charged an extortionate collection of credit conspiracy, and Counts 6 and 7 charged substantive extortionate collection of credit. Counts 8, 9, and 10 charged DeFilippo with murder in aid of racketeering, conspiring to murder in aid of racketeering, and using a firearm during a crime of violence, respectively, for the murder of Gerlando ("George") Sciascia and the use of a firearm during that murder. Count 11 charged Basciano with an additional extortionate credit collection offense.

4

DeFilippo and Basciano were tried jointly in 2006. After an eleven-week trial, the jury returned its verdict on May 9, 2006. It found DeFilippo guilty of Count 1 (racketeering conspiracy), Counts 2, 3, and 4 (illegal gambling and bookmaking), and Count 5 (extortionate credit collection conspiracy). The jury found DeFilippo not guilty of Counts 6 and 7 (substantive extortionate credit collection). The jury failed to reach a unanimous verdict on Counts 8, 9, and 10 (murder of George Sciascia, conspiracy to murder George Sciascia, and use of a firearm during the murder of George Sciascia).

With respect to Count 1, the racketeering conspiracy, the jury also returned a special verdict identifying the racketeering acts on which it had found DeFilippo guilty. The jury determined that the Government had proven two acts involving illegal gambling, one act of extortionate credit collection conspiracy, and the conspiracy to murder, and attempted murder of, David Nunez. The jury concluded that the Government had failed to prove two acts of substantive extortionate credit collection. Finally, the jury failed to reach a unanimous decision as to whether the Government had proven the racketeering acts of conspiracy to murder, and murder of, George Sciascia.

The district court sentenced DeFilippo in March 2007. It imposed a combined sentence principally consisting of forty years' imprisonment. This sentence was fifteen years below the applicable Guidelines sentence. Further details about the sentencing process are provided in the discussion of DeFilippo's sentencing-related challenges, *infra*.

On appeal, DeFilippo challenges his conviction and sentence on several grounds. Here, we address two evidentiary issues and two sentencing challenges. With respect to the district court's rulings on the admission of evidence, we address DeFilippo's claims that the district

5

court erred when it admitted James Tartaglione's testimony concerning two subjects: (1) whether Tartaglione knew of anyone whom the Government had charged with a crime of which that person was not guilty; and (2) an out-of-court statement made by another individual about "killing kids." We also address DeFilippo's two challenges to his sentence. We address all of DeFilippo's other challenges in an accompanying summary order.

## DISCUSSION

### I. Evidentiary Challenges

The first two of DeFilippo's challenges that we address in this opinion relate to the district court's evidentiary rulings, which we review "only for abuse of discretion." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008).

### A. James Tartaglione's "Guilty-as-Charged" Testimony

*1. Facts*

DeFilippo's first challenge involves the Government's questioning of James Tartaglione, a high-ranking member of the Family who testified as a cooperating Government witness at trial. At some point in the past, Tartaglione had recorded his conversations with other members of the Family at the request of the Government. Two of the recordings were introduced into evidence and played for the jury. One recording contained an exchange between Tartaglione and Basciano (DeFilippo's co-defendant) about the possibility that Basciano might be arrested and charged with a 2001 murder:

| Basciano: | They're gonna be tough to pinch me on this. . . . You wanna know why? . . . They have no nothing. . . . How are they going to pinch me on that? |
|---|---|
| Tartaglione: | You, do you want me . . . my honest opinion? (pause) Vinny? |
| Basciano: | Oh yeah yeah. |
| Tartaglione: | I'm gonna give you my honest opinion. What they do— |
| Basciano: | They paint you in a certain light. |
| Tartaglione: | They paint you— |
| Basciano: | A hundred percent. |
| Tartaglione: | Listen, but they don't only hit you with this charge. Nine thousand six hundred and eighty-four other charges. |
| Basciano: | Ha ha ha (laughing) |
| Tartaglione: | So if one sticks, |
| Basciano: | ha ha ha ha ha ha. |
| Tartaglione: | You're guilty of this anyhow, so they throw this in there. |
| Basciano: | I go home tonight I eat my macaroni. |
| Tartaglione: | That's right. |

(Government Appendix at 2.)

Immediately after playing this exchange for the jury, the Government asked Tartaglione what he had meant by "[t]hey paint you in a certain light" and the reference to "[n]ine thousand six hundred and eighty-four other charges." When asked why he had made the statement about "other charges," Tartaglione responded: "[j]ust to win their confidence, just to sit down and say that 'I'm with you.' Just to say something." (Trial Tr. at 4794.) This response fully answered the question but apparently was not the answer the Government had been hoping for. So, the Government continued questioning Tartaglione about what he had meant:

| Q: | During the course of time that you have been involved in the [Family], do you specifically know of anyone that's been charged with a crime that they were not guilty of? |
|---|---|
| Defense: | Objection, 6012. |
| Court: | Sustained. |
| Q: | Sir, have you ever been charged with a crime that you weren't guilty of? |
| A: | No. |
| Defense: | Objection. |
| Court: | Overruled. |
| Q: | Have you ever been charged with a crime that you weren't guilty of? |

7

| | |
|---|---|
| Defense: | Objection. |
| Court: | Overruled.  You may answer. |
| A: | No. |
| Q: | Are you aware, based on your experience in organized crime, of anyone that's been charged with a crime they didn't commit? |
| Defense: | Objection. . . . |
| Court: | Sustained. |
| Q: | ***When you made a reference to "9,684 other charges," had you known, with respect to that comment, that specific comment, had you known of anyone in organized crime that had been charged with a crime that was not guilty of it?*** |
| Defense: | Objection. . . . |
| Court: | You may answer. |
| A: | ***No.  It's not so.*** |

(Trial Tr. at 4794-96 (emphasis added).)  Defense counsel renewed their objections at the next break in the trial, arguing that this line of questioning was inadmissible under "all of" the Rules of Evidence. (Trial Tr. at 4829.)  The Government claimed that the question and answer were relevant as tending to show Tartaglione's state of mind when he made the "other charges" statement in the taped conversation.  The district court overruled the objection and did not strike the testimony.

On appeal, DeFilippo argues that this testimony should have been excluded as impermissible opinion testimony.  He claims that Tartaglione was essentially opining that everyone involved in organized crime whom the Government charges with a crime is guilty of that crime—and he asserts that Tartaglione's personal opinion on this subject was not relevant to his (DeFilippo's) own guilt.  DeFilippo also argues that the testimony was inadmissible under Federal Rule of Evidence 403 because its prejudicial effect substantially outweighed its probative value.

In response, the Government first suggests that DeFilippo failed to raise a Rule 701 opinion testimony challenge at trial and has therefore not preserved that argument for appeal. With respect to the merits of the challenge, the Government argues that the testimony was entirely relevant because it explained what Tartaglione had meant by the "other charges" statement. The Government characterizes that statement as having implied that Tartaglione had actual knowledge of instances in which organized crime defendants had been charged with crimes of which they were innocent—and asserts that it was important to clarify whether Tartaglione had such personal knowledge. The Government further claims that the testimony did not violate Rule 403 because Tartaglione did not suggest that all criminal defendants are guilty.

2.      *Law*

Contrary to the Government's claims, DeFilippo sufficiently raised a "lay opinion" challenge before the district court to preserve the issue for appeal. At sidebar, his attorney argued that Tartaglione's "other charges" statement was not "permissible under the rules of evidence, all of them, including rule 403." (Trial Tr. at 4829.) "What the government did there," counsel continued, "was essentially to tell this jury that it's *the opinion of this witness* . . . that when somebody is charged they are guilty." (Trial Tr. at 4829-30 (emphasis added).) DeFilippo further accused the Government of trying "to obtain a conviction *based on this man's opinion*." (Trial Tr. at 4830 (emphasis added).) These arguments gave the district court and the Government sufficient notice that DeFilippo believed that Tartaglione's statement was inadmissible because it improperly included an opinion about an irrelevant subject. The issue has been preserved for appeal.

9

While examining Tartaglione, the Government asked a series of three similar questions. First, it asked Tartaglione whether he "specifically" knew of "anyone" in the Family who had been "charged with a crime that they were not guilty of." Next, the Government asked whether the witness was "aware" of "anyone" who had been "charged with a crime they didn't commit." The district court properly sustained objections to these questions.

The third time, however, the Government asked Tartaglione whether, when he made his statement regarding the alleged "9,684 other charges," he "had . . . known of anyone" who "had been charged with a crime that was not guilty of it." In response to the defense objection, the Government asserted that this question probed the witness's state of mind, by asking Tartaglione what he "had . . . known" at the time he made the "9,684 [crimes]" statement instead of inquiring about what he knew at the time of his testimony.

Although it is possible to read the question as addressing the witness's state of mind, we are skeptical of the Government's articulated rationale. The Government had already explored the witness's state of mind, in an appropriately open-ended manner, when it asked Tartaglione, "[w]hen you said, '9,684 other charges,' what did you mean by that?" The witness gave a complete answer to that question—Tartaglione testified that he was trying to ingratiate himself with Basciano by making derogatory comments about the Government. If the only thing the Government was concerned about was Tartaglione's state of mind when he made the statement, there was no need to ask any more questions.

Instead, the Government began a line of questioning that seems as if it were designed to prompt the witness to declare that anyone linked to organized crime who is charged with a crime is in fact guilty of that crime. The Government tried three times to elicit such a statement from

10

the witness and stopped the line of questioning only when the witness said what the Government wanted to hear. Furthermore, even as framed by the Government, the third and last of those questions does not explore what motivated Tartaglione to make the "9,684 other charges" statement. Rather, it probes what he knew about the criminal behavior of persons other than the defendant. This suggests to us that the Government had some other goal in mind. The testimony elicited by the Government's question in this regard was not about DeFilippo and did not address issues relating to the defendant's guilt, so it had little or no probative value. And the potential for unfair prejudice was real. We conclude, therefore, that the Government should not have pressed this line of questioning and the district court erred in overruling the defendant's objection.

Despite our concerns about the Government's conduct, however, we conclude that the error was harmless. The Government presented substantial evidence at trial establishing DeFilippo's guilt. The improper question and answer were not referenced in the Government's summation or otherwise highlighted. Evidentiary errors affect substantial rights, meriting reversal, only if they have a "substantial and injurious effect or influence" on the jury's verdict. *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003) (quoting *United States v. Castro*, 813 F.2d 571, 577 (2d Cir. 1987)). Though we cannot condone the Government's examination technique, we are confident that Tartaglione's brief response to the Government's improper question had no such effect on the verdict here.

**B.    Tartaglione's Recollection of the "Killing Kids" Statement**

*1.    Facts*

11

At trial, Tartaglione testified about two conversations that he had recorded at the direction of law enforcement. In fact, however, Tartaglione had worn a wire and recorded conversations on 40 occasions. On direct examination, the Government did not introduce any evidence of the other 38 recordings or conversations, nor did it question Tartaglione about the substance of those conversations.

On cross-examination, defense counsel sought to discredit Tartaglione's testimony by showing that he did not remember the two conversations at issue and was only able to testify about them because he had been coached by the Government. To that effect, counsel questioned Tartaglione about his ability to recall the other, unintroduced 38 conversations and implied that Tartaglione could not remember those conversations because he had not been coached about them.

On redirect, the Government struck back and asked Tartaglione about a recording that he could remember:

| | |
|---|---|
| Government: | You don't remember each and everything that was said on each of those recordings, do you? |
| Tartaglione: | No. |
| Government: | [D]id you ever have a meeting with Tony Urso and Joe Cammarano? |
| Tartaglione: | Yes. . . . |
| Government: | Did you ever make recordings of those meetings? |
| Tartaglione: | Yes. |
| Government: | As you sit here today, do you have a specific recollection of something that Mr. Urso said about killing kids? |
| Tartaglione: | Yes. |
| Defense: | Objection, move to strike. |
| Government: | What was said? |
| Defense: | Relevance. |
| Court: | Side bar. . . . I've considered all the arguments and I find it's appropriate redirect. |
| Government: | Mr. Tartaglione, I was asking you before a tape recording [sic] that was made with Mr. Urso and Mr. Cammarano, do you remember that? |

12

| | |
|---|---|
| Tartaglione: | Yes. |
| Government: | Do you remember a comment about the murdering the wives and children of cooperating witnesses? |
| Tartaglione: | Yes. |
| Government: | Can you explain to the jury what was said by Mr. Urso? |
| Tartaglione: | That anybody that's cooperating that we should hack out their kids or the family, just so—and throw them in the streets and make a lesson out of this. |
| Government: | Why would that make a lesson? |
| Tartaglione: | That if you became a cooperator, you would have second thoughts about being a cooperator. . . . |
| Government: | Why would it cause a problem for the Bonanno Family for members of the Bonanno Family to be cooperating? |
| Tartaglione: | Well, you cooperate, you tell them everything that you know about the family. |
| Government: | Would that relate to criminal activity? |
| Tartaglione: | It would be criminal activity and indictments. |
| Government: | When Mr. Urso said that, Mr. Basciano wasn't present, was he? |
| Tartaglione: | No. |
| Government: | Mr. DeFilippo wasn't present? |
| Tartaglione: | No. |
| Government: | At the time was Mr. Urso the highest ranking member of the Bonanno Family on the street? |
| Tartaglione: | Yes. |

(Trial Tr. at 5259-65.)

In the midst of this questioning, the defense asked for a side bar and objected to the line of questioning. Both defense attorneys argued that this questioning was not relevant to this case, and that even if it were relevant as rebuttal, its admission violated Rule 403. The Government argued that the defense had been allowed to pick and choose the portions of the 38 recorded conversations that it used to attack Tartaglione's credibility. Defense counsel, according to the Government, had opened the door to the Government's use of the same method of questioning. After hearing these arguments, the district court overruled the defense objection to this questioning.

13

DeFilippo raises the same arguments on appeal. The Government contends that the questioning was a proper way to rehabilitate Tartaglione's credibility in response to DeFilippo's attempt to impeach it. The Government further claims that the testimony was not prejudicial because the prosecutor made a point of establishing that DeFilippo had not been present for the conversation and because no other evidence linked DeFilippo to Urso. And finally, the Government argues that the testimony was so similar to other evidence that had been introduced about murders and other violent crimes that it could not have prejudiced the jury.

*2.     Law*

We find no merit in DeFilippo's claim that the testimony was not relevant; it was obviously relevant to Tartaglione's ability to recall previous conversations without having been coached by the Government, an issue that the defense made relevant in its own questioning. The more difficult question is whether the testimony should have been excluded under Rule 403.

In relevant part, Federal Rule of Evidence 403 provides for the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. We "uphold Rule 403 rulings unless the district court has abused its discretion." *Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S. Ct. 1140, 1145 (2008). "[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational." *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006). In light of the deferential nature of our review, "appellate courts reviewing a district court's evaluation of evidence under Federal Rule of Evidence 403 'generally maximiz[e] its probative value and minimiz[e] its prejudicial

14

effect.'" *United States v. LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004) (alterations in original) (quoting *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002)).

Although our review is deferential, it is informed by several guiding principles that elaborate on the terms "prejudice" and "probative value." The Supreme Court has observed that "[t]he term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The question is not whether the evidence was suggestive of guilt—as all relevant evidence offered against the defendant would suggest guilt—but rather, whether "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). This "adverse effect" may consist of a "tendency of the evidence [in question] to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant." *Id.*

When we balance this potential prejudice against the probative value of the evidence, our judgment is "informed by the availability of alternative means to present similar evidence." *Awadallah*, 436 F.3d at 132. The Supreme Court has approved of the consideration of such "evidentiary alternatives," holding that "when Rule 403 confers discretion by providing that evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives." *Old Chief*, 519 U.S. at 184-85. It is with these principles in mind that we now turn to whether the district court erred in allowing the

15

Government to question Tartaglione about Urso's reference to killing cooperating witnesses and their children.

We are troubled by the Government's decision to rehabilitate Tartaglione's credibility and demonstrate his ability to remember past events through the use of Urso's highly inflammatory statement. The Government asserts that because Tartaglione testified that neither defendant was present when the quoted speaker (Urso) made the offending statement, any prejudicial impact of Urso's statement was thus removed. We disagree. After eliciting Urso's statement from Tartaglione—and thereby demonstrating Tartaglione's ability to remember, which was the asserted reason for asking about the statement—the Government continued and asked Tartaglione about why the Family would seek to punish cooperating witnesses and about Urso's leadership position in the Family. This further questioning went far beyond establishing Tartaglione's ability to remember other recorded conversations. It proved that Urso was stating Family policy. We have little doubt that it was intended "to have [this] adverse effect upon [DeFilippo]," an effect that went well beyond the purpose that "justified its admission into evidence," *Figueroa*, 618 F.2d at 943.

Our concern is compounded by our confidence that the Government could have sought to rehabilitate Tartaglione's credibility with any one of a number of "evidentiary alternatives" to Urso's highly prejudicial statements about killing the children of cooperating witnesses. *See Old Chief*, 519 U.S. at 185. Tartaglione had recorded 38 conversations. We have difficulty believing that none of those conversations included memorable yet neutral (or less inflammatory) statements about which Tartaglione could have testified. The abundance of the possible rehabilitating evidence, along with the extreme nature of the evidence the Government chose to

16

use, strongly suggests that it was precisely the "unfairly prejudicial" effect of Urso's statement that caused the Government to select it. *Old Chief*, 519 U.S. at 183.

We nevertheless find that the district court did not abuse its considerable discretion when it admitted Tartaglione's testimony about Urso's statement notwithstanding DeFilippo's Rule 403 challenge. Despite our misgivings about the Government's conduct in introducing the testimony it did through Tartaglione, the district court "conscientiously balanced the proffered evidence's probative value with the risk for prejudice" and its ruling was not "arbitrary or irrational," *Awadallah*, 436 F.3d at 131. Accordingly, we defer to its judgment.

## II. Sentencing Challenges

We review sentences "under an abuse-of-discretion standard" for both procedural and substantive unfairness. *Gall v. United States*, 128 S. Ct. 586, 597 (2007). With regard to procedural unfairness, we will find an abuse of discretion where the district court 'fail[ed] to calculate (or improperly calculat[ed]) the Guidelines range, treat[ed] the Guidelines as mandatory, fail[ed] to consider the § 3553(a) factors, select[ed] a sentence based on clearly erroneous facts, or fail[ed] to adequately explain the chosen sentence. *Id.*

### A.    Whether the Sciascia Murder Was Relevant Conduct

*1.    Facts*

The Government charged DeFilippo with the murder of George Sciascia as both an independent offense (Counts 8, 9, and 10) and as racketeering acts under the Count 1 RICO conspiracy. According to the Government, the head of the Family, Joseph Massino, had ordered

17

Sciascia killed in retaliation for Sciascia having been disrespectful of a member of the Family. A cooperating witness testified about his involvement in the murder, and he stated that DeFilippo was the shooter. At trial, the jury found that the Government had failed to prove DeFilippo's responsibility for the murder of George Sciascia, either as an independent offense or as a racketeering act under Count 1. At sentencing, however, the district court found by a preponderance of the evidence that DeFilippo was responsible for the Sciascia murder, and it included the Sciascia murder as relevant conduct under the Guidelines. DeFilippo objected to the inclusion of the Sciascia murder as relevant conduct on the bases of both relevance and lack of proof.

On appeal, DeFilippo does not challenge the district court's factual finding that DeFilippo was responsible for the Sciascia murder. Instead, he argues that the Sciascia murder was not relevant conduct because it was not related to a conspiratorial object of which DeFilippo was convicted. DeFilippo claims that in Count 1, the RICO conspiracy, he was charged with a conspiracy having multiple objects (i.e., the racketeering acts identified in the Indictment). According to DeFilippo, these racketeering acts fall into two categories relating to two overarching conspiratorial objectives: (1) generating money for members and associates of the Family; and (2) employing Family resources to settle personal grievances.

At trial, DeFilippo argues, he was convicted only of racketeering acts that fell into the "generating money" category (i.e., the gambling acts and the Nunez murder), while he was not found guilty of the racketeering acts that fell into the "personal grievances" category (i.e., the Sciascia murder, which was allegedly in retaliation for Sciascia's disrespect of a Family member). He believes that the jury therefore found him guilty of a conspiracy that had as its

18

objective generating money for members and associates of the Family. He believes that the jury did not find him guilty of a conspiracy that had revenge as its purpose. He further concludes that because the jury did not find him guilty of a "revenge" conspiracy, the Sciascia murder—which he claims was related only to the "revenge" conspiracy—is not relevant to his conviction.

For support, DeFilippo relies on Sentencing Guidelines § 1B1.2(d), which instructs the sentencing court, when faced with a conviction for a multi-object conspiracy, to treat it as several convictions for single-object conspiracies. The Commentary emphasizes that when a guilty verdict or plea does not establish which offense was the object of the conspiracy of which the defendant was convicted, the district court should apply § 1B1.2(d) to that offense only if it finds the defendant guilty of conspiring to commit that offense beyond a reasonable doubt. U.S. Sentencing Guidelines Manual § 1B1.2(d) cmt. app. n.4 (2006). DeFilippo urges us to find that because the jury verdict did not establish that he was guilty of the "revenge" offense, which he asserts was an "object" of his RICO conspiracy, the district court erred in finding him responsible for the "revenge" offense by only a preponderance of the evidence.

2.    *Law*

DeFilippo is mistaken in his reliance on Sentencing Guidelines § 1B1.2, which governs the Guidelines calculation for multi-object conspiracies, because a RICO conspiracy is not a multi-object conspiracy. A RICO conspiracy is a single-object conspiracy, with the object being to engage in racketeering; predicate racketeering acts are not conspiratorial objects. 18 U.S.C. § 1962(d) (2006) ("It shall be unlawful for any person *to conspire to violate* any of the provisions of subsection (a), (b), or (c) of this section." (emphasis added)); *see also United States v.*

19

*Yannotti*, No. 06-5571-cr, 2008 WL 4071691, at *13 (2d Cir. Sept. 4, 2008) ("[T]he RICO conspiracy with which he was charged had only one object—to conduct or participate in the affairs of the charged enterprise . . . through a pattern of racketeering."); *United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir. 1984) ("A RICO conspiracy under § 1962(d) based on separate conspiracies as predicate offenses is not merely a 'conspiracy to conspire' as alleged by appellants, but is an overall conspiracy *to violate a substantive provision of RICO . . . .*" (emphasis added)) (abrogated on other grounds by *Salinas v. United States*, 522 U.S. 52 (1997)); *United States v. Carrozza*, 4 F.3d 70, 79 (1st Cir. 1993) ("[Sentencing Guidelines] § 1B1.2(d) was enacted to deal with multiple object conspiracies charged in a single count. A RICO conspiracy, however, is considered a single object conspiracy with that object being the violation of RICO."). Sentencing Guidelines § 1B1.2 is, therefore, inapplicable. *Yannotti*, 2008 WL 4071691, at *13. Instead, a RICO offense is governed by Sentencing Guidelines § 2E1.1, which also governs the treatment of underlying predicate acts. *See* U.S. Sentencing Guidelines Manual § 2E1.1(a) (2006) (instructing the court to apply offense level 19 "or . . . the offense level applicable to the underlying racketeering activity"); *id.* at cmt. app. n.1 (instructing that "[w]here there is more than one underlying offense," the court should "treat each underlying offense as if contained in a separate count of conviction").

When reviewed in light of the Guidelines that do apply, we find that the district court appropriately considered the Sciascia murder to be relevant conduct. Conduct is relevant if it was "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.

20

Sentencing Guidelines Manual § 1B1.3(a)(1) (2006).  When the offense of conviction is a RICO conspiracy, relevant conduct may include "underlying predicate acts," even if not proven at trial beyond a reasonable doubt, as long as the sentencing court finds that they were proven "by the lower preponderance of the evidence standard." *Yannotti*, 2008 WL 4071691, at *13 (citing *United States v. Vaughn*, 430 F.3d 518, 526-27 (2d Cir. 2005)).  The Sciascia murder was underlying racketeering activity, and while DeFilippo has challenged the burden the district court applied in making its finding, he does not challenge the finding itself that DeFilippo was responsible for it.  We therefore affirm the district court's inclusion of the Sciascia murder as relevant conduct in its Guidelines analysis.


### B.      The Version of the Guidelines Applicable to the Nunez Murder

*1.     Facts*

The district court, when sentencing DeFilippo in 2007, chose to use the post-2004 Guidelines to calculate the base offense level for the 1985 attempted murder of David Nunez, which was a predicate racketeering act under the RICO conspiracy charged in Count 1.  Prior to November 2004, the Guidelines base offense level for an attempted murder was 28.  U.S. Sentencing Guidelines Manual § 2A2.1(a)(1) (2003).  Effective November 1, 2004, the base offense level for attempted murder became 33.  U.S. Sentencing Guidelines Manual § 2A2.1(a)(1) (2004).

The district court used the post-2004 Guidelines because it found that DeFilippo's involvement in the RICO conspiracy had continued beyond his arrest in 2003.  The court based this finding on several items of evidence introduced by the Government.  First, the Government

had introduced a list of names, including DeFilippo's, that had been seized during the arrest of Anthony Rabito, the Family's consigliere, in 2007. The Government alleged that the list was of then-current captains in the Family, and it asserted that DeFilippo's inclusion in the list indicated his continuing membership. Second, one witness testified at trial that membership in the Family was lifelong and continued even when an individual had been arrested. Third, the Government introduced a recorded conversation between Basciano and another member of the Family about the use of the Family's "war chest" funds to pay for DeFilippo's legal fees.

In response, DeFilippo's attorney proffered that DeFilippo's fees were being paid by his family members, not by the Family war chest. DeFilippo requested a hearing on this point. He argued further that the law presumed that membership in a conspiracy ends upon incarceration, and he claimed that the Government had not rebutted that presumption. The district court refused the request for a hearing because, during the lengthy interim between verdict and sentencing, the defense failed to introduce any documentary proof that DeFilippo's family members were paying his legal fees.

On appeal, DeFilippo argues that the Government failed to rebut an alleged presumption that a person withdraws from a conspiracy when he is arrested. DeFilippo also challenges the district court's refusal to hold a hearing on t his issue, as requested.


2.    *Law*

We find no support for DeFilippo's assertion that incarceration creates a rebuttable presumption of withdrawal from a conspiracy. For support, DeFilippo cites to *United States v. Escobar*, 842 F. Supp. 1519 (E.D.N.Y. 1994), where the district court held that "[w]hile the

arrest and incarceration of a conspirator does not always constitute withdrawal from the conspiracy, there is a rebuttable presumption that incarceration constitutes withdrawal by that conspirator." *Id.* at 1528. In *Escobar*, the district court was deciding whether the Government could admit a statement made by the defendant's coconspirator after his arrest. *Id.* After reviewing the factual context of the statement, the court concluded that the speaker had not been a member of the conspiracy when he made the statement, in part because he had been incarcerated, and that the statement was therefore not admissible under the coconspirator hearsay exception. *Id.*

The *Escobar* court's statement regarding a rebuttable presumption that a person withdraws from a conspiracy when arrested is not the law of this Circuit. As we have noted, "a conspirator who has been arrested remains responsible for acts committed in furtherance of the conspiracy by co-conspirators who are still at large." *United States v. Cruz*, 797 F.2d 90, 98 (2d Cir. 1986); *see also United States v. Joyner*, 201 F.3d 61, 72 (2d Cir. 2000) (holding that although the defendant "was incarcerated when those offenses occurred, he remained a coconspirator—he soon emerged from jail to resume participation in the ring's drug-trafficking—and was responsible for crimes that were foreseeable consequences of the conspiracy"), *reh'g denied and modified on other grounds by United States v. Joyner*, 313 F.3d 40 (2d Cir. 2002). Although arrest *may* constitute withdrawal, whether it does is a fact-dependent question: "While arrest or incarceration may constitute a withdrawal from a conspiracy, it does not follow that in every instance it must, and whether a coconspirator's imprisonment constitutes a withdrawal must be decided by the jury in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence."

23

*United States v. Flaharty*, 295 F.3d 182, 192-93 (2d Cir. 2002) (citations and internal quotation marks omitted). We made no reference to any purported presumption.

Even if we were to find a presumption to exist, the Government introduced sufficient evidence to overcome it. Evidence established that (1) membership in the Family was lifelong and continued beyond arrest and incarceration; (2) after his arrest, DeFilippo remained on a list of active members that included other individuals who had also been incarcerated; and (3) DeFilippo continued to receive funds from the Family's "war chest." These pieces of evidence, considered together, demonstrate DeFilippo's continuing membership in the Family after his arrest.

We also find that the district court did not abuse its discretion when it refused DeFilippo's request for a hearing. Neither the Due Process Clause nor the Guidelines require the district court to resolve sentencing disputes through a "'full-blown evidentiary hearing.'" *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005) (quoting *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996)). "[T]his is not the sort of situation where all a defendant need do is knock on the hearing room door, and it will automatically open to him." *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991). The district court is required only to "'afford the defendant some opportunity to rebut the Government's allegations,'" *Phillips*, 431 F.3d at 93 (quoting *Slevin*, 106 F.3d at 1091), and "[t]he procedures to be adopted for resolution of such disputes lie within the sound discretion of the sentencing judge," *United States v. Berndt*, 127 F.3d 251, 257 (2d Cir. 1997).

Here, despite having ample time, DeFilippo failed to introduce any evidence that his attorney's fees were being paid by members of his own family. DeFilippo did not even offer an

24

affidavit to that effect.  Even now on appeal, DeFilippo has not identified the evidence he would have introduced at a hearing nor described what the evidence would have shown.  The district court did not abuse its discretion by resolving the dispute over attorney's fees without a hearing.

## IV.  Conclusion

We have considered all of DeFilippo's arguments, and for the reasons stated herein and in an accompanying summary order, we AFFIRM the judgment of the district court.